IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BRAD RUSH, as Administrator of the Estate of Jeffrey Dennis, Deceased, *Plaintiff*, v. THE CITY OF PHILADELPHIA, et al., *Defendants*. | Case No. 2:19-cv-00932-JDW |

## MEMORANDUM

Many police encounters, especially ones that lead to the use of deadly force, are high-stakes, fast-developing, chaotic situations. It comes as no surprise, then, that the evidence about such events is often confused, ambiguous, or even contradictory. This is true even with the benefit of video evidence of an incident. While a video might limit some of the confusion, it cannot answer every question, either because it only shows events from a single angle, the sound is absent or garbled, or some actions might occur off-camera. This is just such a case.

On the afternoon of August 20, 2018, seven plainclothes Philadelphia Police Officers surrounded Jeffrey Dennis in his car. They boxed him in with two cars and tried to get him out of his car. He tried to escape, moving his car back and forth. At the end of the encounter, after his car appeared to stop moving, Officer Richard Nicoletti shot Mr. Dennis three times and killed him. A nearby security camera captured most of the incident on video. But even with the video, the evidence about what happened and whether circumstances justified the shooting conflicts.

Brad Rush, as the administrator of Mr. Dennis's estate, asserts claims against Officer Nicoletti and the City of Philadelphia. Because the evidence about what happened that day conflicts, the Court will deny Officer Nicoletti's summary judgment motion. In addition, because a jury could conclude that the City (through the Philadelphia Police Department) did not do enough to address allegations of Officer Nicoletti's past misconduct, the Court will deny the City's summary judgment motion. A jury will have to decide this case.

**I.      BACKGROUND**

**A.      Philadelphia Police Department Policies**

PPD Directive 10.1 provides that police officers may only use deadly force in "the most **extreme circumstances**" after all lesser means of force have failed or could not reasonably be employed. (ECF No. 44-8 at 1.A. (emphasis in original).) It explains that that police officers shall not use deadly force unless they have an objectively reasonable belief that they must protect themselves or another person from death or serious bodily injury. (*Id.* at I.C.) It also prohibits police officers from discharging their firearms into moving vehicles, unless they are being threatened with deadly force by something other than the vehicle. The policy states that "[m]oving into or remaining in the path of a moving vehicle, whether deliberate or inadvertent, **SHALL NOT** be justification for discharging a firearm at the vehicle or any of its occupants."(*Id.* at 4.H., 4.H.2 (emphasis in original).)

PPD's Internal Affairs Division ("IAD") receives notice of and investigates any incident involving an officer's discharge of a firearm (*Id.* at 5.A.3, 6.F.) While PPD investigates all police discharges, there is no mechanism or policy in place to

investigate the circumstances that led to a lawsuit against an officer stemming from something other than a police discharge. Lawsuits filed against an officer do not appear in his or her disciplinary records, either.

### B. Officer Nicoletti's History

Prior to August 20, 2018, Officer Nicoletti had shot at two people. On April 4, 2006, Officer Nicoletti shot at a man he was chasing after he claimed the man pulled a gun on him. Officer Nicoletti fired four shots, but neither the man nor the gun was ever found. On March 26, 2012, he shot a man who was fleeing in a vehicle. Officer Nicoletti and other undercover officers in street clothes boxed in the suspect. When the suspect tried to drive away, Officer Nicoletti opened fire. He claimed the man was driving at another officer. No video footage was available to confirm this, and the car did not strike any officer. The Firearms Review Board ("FRB") found that Officer Nicoletti had violated police procedure on the use of deadly force when he shot at the moving vehicle. The FRB referred Officer Nicoletti to the Police Board of Inquiry ("PBI") for discipline. The PBI found Officer Nicoletti not guilty of policy violations and declined to discipline him for violating PPD policies.

Beyond weapon discharges, Officer Nicoletti's disciplinary record also notes that there were four incidents where citizens complained of "physical abuse" by Officer Nicoletti. (ECF No. 47-8, Ex. Z.) These complaints spanned his career, with the last one occurring in September 2011. Officer Nicoletti has also faced litigation for excessive force and taking steps to cover up the use of excessive force. In *D'Ambra v. Nicoletti, et al.*, a plaintiff accused Officer Nicoletti of using excessive force when

3

entering Ms. D'Ambra's home and detaining her. The case settled. The PPD did not investigate the incident, and the lawsuit does not appear in Officer Nicoletti's record.

In *Roseboro v. Binns, et al.*, a federal jury found that Officer Nicoletti violated the Fourteenth Amendment rights of Michael Roseboro when he "took affirmative steps to conceal and/or cover-up" the beating of Mr. Roseboro by fellow officers. (ECF No. 46-1, ¶ 34; ECF No. 1, Exs. M-N.) After the jury verdict, the case settled. The PPD did not investigate the underlying incident. Because there is no PPD policy to include litigation in an officer's records, the PBI panel that considered Officer Nicoletti's 2012 shooting did not have or consider these incidents.

### C. The Shooting

On August 20, 2018, Philadelphia Police Officers Nicoletti, Bogan, Fitzgerald, Galazka, Sumpter, Sergeant Schuck, and Lieutenant Muldoon were staking out a house suspected of being used for drug activity. The plan was to execute a search warrant for the house, in which Mr. Dennis resided. Mr. Dennis was not in the building. As the officers got into position around the property, Officer Galazka noticed Mr. Dennis drive past him. Sgt. Schuck decided to stop the car. A nearby store's security camera captured what happened next.

As Mr. Dennis drove to an intersection, Sgt. Schuck and Officer Galazka turned the wrong way down the street to block Mr. Dennis's forward progress. Mr. Dennis reversed, but at that moment another unmarked police vehicle advanced from behind, cutting off Mr. Dennis's escape. He began slowly moving forward and to the right in an attempt to get around the car in front of him. Officer Galazka moved his car forward to block the space in which Mr. Dennis could maneuver. Mr. Dennis's car and

Officer Galazka's car made contact at a low rate of speed. Mr. Dennis then reversed, hitting the unmarked car behind him, and then tried to maneuver around Officer Galazka's car towards the sidewalk.

At this point, the officers converged on the car on foot. None of the officers was in uniform. Most had their guns drawn. One officer tried to break the passenger side window by repeatedly slamming his gun into it. Within ten seconds, five officers in street clothes had surrounded the car, all with guns drawn. The car remained motionless for several seconds as the officers, including Officer Nicoletti, tried to open the driver's-side door. While the other officers tried to gain access to the car, Officer Galazka went to his trunk and retrieved a long metal tool. He struck the driver's window with the metal object, shattering it, before retreating to his car.

As soon as Officer Galazka struck the driver's side window, Mr. Dennis began haltingly moving his car forward and to the right, onto the sidewalk. Officer Bogan was in the path of Mr. Dennis's car, but he was able to step out of the way. Mr. Dennis appeared to hit the brakes several times when he came close to hitting an officer. While this was happening, Officer Galazka ran back to his unmarked car and moved it forward, almost hitting Mr. Dennis's car and two officers. As Mr. Dennis's car lurched onto the sidewalk, Officer Fitzgerald reached through the broken driver's side window. Officer Bogan saw Mr. Dennis reach down to the center console on his right side and notified the other officers.

The car reversed, pulling Officer Fitzgerald with it, although Officer Fitzgerald was able to stay on his feet. Defendants contend that Officer Fitzgerald was pinned between Mr. Dennis's car and Officer Galazka's car. Plaintiff denies that claim, and

5

the video is inconclusive. A second or two later, after Mr. Dennis began moving the car towards to curb again, Officer Fitzgerald let go of the car and limped away. Mr. Dennis then reversed yet again, while Officer Nicoletti and Sgt. Schuck were on the driver side, moving with the car and trying to open the door. Officer Nicoletti had his gun drawn, pointing at the driver side window.

At this point, Officer Bogan was in the path of Mr. Dennis's vehicle, as it faced the sidewalk. Officer Bogan and Officer Nicoletti both had their guns drawn, while Sgt. Schuck attempted to open the driver's door. Neither fired. Officer Galazka reversed his car several feet, which gave Mr. Dennis more room to maneuver forward. Mr. Dennis reversed and turned the car 90 degrees to face Officer Galazka's vehicle. Officer Bogan holstered his weapon as the car faced forward, away from the sidewalk where Officer Bogan was standing. Mr. Dennis and Officer Galazka both accelerated their vehicles forward, colliding with some force. Both cars jerked to a stop.

Approximately two seconds later Officer Nicoletti, who was still by the driver side door, hopped backwards, aimed his gun, and fired three shots, striking Mr. Dennis in the chest and head. No other officers had their guns drawn. The officers then converged on the motionless car, which was pointed away from any of the officers on foot. Mr. Dennis was unarmed. The whole incident lasted approximately 48 seconds. A medic pronounced Mr. Dennis dead at the scene.

The Use of Force Review Board investigated Officer Nicoletti's use of deadly force. It concluded that Officer Nicoletti violated PPD policy because he fired at a vehicle. (ECF No. 46-6 at Ex. T.) (The parties have not explained to the Court the relationship between IAD, the FRB, and the Use of Force Review Board, but they all

appear to have some role in investigating police-involved shooting.) Officer Nicoletti received a 30-day suspension without pay as punishment.

### D. Procedural History

Brad Rush, acting as Administrator of Mr. Dennis's estate, brought this action on behalf of Mr. Dennis in the Court of Common Pleas of Philadelphia County on February 27, 2019. Defendant, Officer Nicoletti removed the action to this Court on March 5, 2019. The Complaint asserts (a) a claim under 42 U.S.C. § 1983 for excessive force against Officer Nicoletti in his official and individual capacity, (b) a claim under 42 U.S.C. § 1983 against the City of Philadelphia for municipal liability, and (c) claims for assault and battery under state law. On October 16, 2020, Defendants filed summary judgment motions, which are now ripe for decision.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) permits a party to seek, and a court to enter, summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he plain language of Rule 56[(a)] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quotations omitted). In ruling on a summary judgment motion, a court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quotation omitted). Where there is video footage

related to the claims, the Court must not draw inferences that are "blatantly" inconsistent with the video evidence. *Id*. at 380-81. However, "[t]he non-moving party may not merely deny the allegations in the moving party's pleadings; instead he must show where in the record there exists a genuine dispute over a material fact." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citation omitted).

Where "the victim of deadly force is unable to testify," *Abraham v. Raso*, 183 F.3d 279, 294 (3d Cir. 1999), the Third Circuit has recognized that when a court is ruling on summary judgment in such a case, the court "should be cautious . . . to 'ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story—the person shot dead—is unable to testify.'" *Id.* (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)). Thus, a court should avoid simply accepting "'what may be a self-serving account by the officer. It must also look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational fact finder that the officer[s] acted unreasonably.'" *Id.* (quoting *Scott*, 39 F.3d at 915).

### III.   ANALYSIS

####   A.   The Video

Where a video of an incident exists, the Court cannot disregard that video and credit witnesses who offer competing versions of events. *See Scott*, 550 U.S. at 379-80. The decision only applies if the video blatantly contradicts a witness's version of events. *See El v. City of Pittsburgh*, 975 F.3d 327, 333 (3d Cir. 2020); *Patterson v. City of Wildwood*, 354 F. App'x 695, 697-98 (3d Cir. 2009). Where a video is subject to interpretation, a court must interpret it in the light most favorable to the nonmoving

8

party. The video of this incident is not conclusive. Mr. Dennis is not visible. There is no sound. Officers move in and out of frame, and cars block the view of some of their actions. The Court therefore interprets the video in the light most favorable to Plaintiff as the non-moving party where it is subject to multiple interpretations.

### B. Section 1983 Claims

Section 1983 provides a "civil remedy for the 'deprivation of any rights, privileges, or immunities secured by the Constitution and laws.'" *Halsey v. Pfeiffer*, 750 F.3d 273, 290 (3d Cir. 2014) (quoting 42 U.S.C. § 1983)). To state a claim under Section 1983, a plaintiff must show that "'some person has deprived him of a federal right . . . [and] that the person who has deprived him of that right acted under color of state or territorial law.'" *Id.* (quoting *Gomez v. Toledo*, 446 U.S. 635, 640 (1980) (alteration in original)).

#### 1. Individual liability

##### a. Official capacity

A suit against a government official, including a police officer, in his official capacity, is a suit against the government entity. *See Gregory v. Chehi*, 843 F.2d 111, 120 (3d Cir. 1988) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978)). A municipality cannot be held liable under § 1983 for its employees' torts under a theory of *respondeat superior*. *McGreevy v. Stroup*, 413 F.3d 359, 367 (3d Cir. 2005) (citing *Monell*, 436 U.S. at 691, 694). Therefore, the Court must dismiss Plaintiff's excessive force claim against Officer Nicoletti in his official capacity because it raises no independent, cognizable theory of liability.

### b. Individual capacity

Qualified immunity shields police officers from liability for civil damages brought pursuant to § 1983 "so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Bland v. City of Newark*, 900 F.3d 77, 83 (3d Cir. 2018) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11, 136 S. Ct. 305, 308 (2015)). The officer seeking qualified immunity has the burden of establishing their entitlement to the affirmative defense. *Halsey*, 750 F.3d at 288 (citing *Reedy v. Evanson*, 615 F.3d 197, 223 (3d Cir. 2010)). To determine whether an officer is entitled to the affirmative defense of qualified immunity for a § 1983 claim, a court must determine (1) whether the officer violated a constitutional right and, if so, (2) whether the right was clearly established.

### i. Constitutional violation

Police officers may commit a battery pursuant to a lawful arrest, but the use of excessive force negates that privilege. *See Groman v. Twp. of Manalpan*, 47 F.3d 628, 634 (3d Cir. 1995). Courts analyze excessive force claims "under the Fourth Amendment and its 'reasonableness' standard." *Davenport v. Borough of Homestead*, 870 F.3d 273, 278-79 (3d Cir. 2017) (citing *Graham v. Connor*, 490 U.S. 386, 39 (1989)). To prevail on an excessive force claim, a plaintiff must establish "that a 'seizure' occurred and that [such seizure] was unreasonable." *Abraham v. Raso*, 183 F.3d 279, 288 (3d Cir. 1999) (citing *Brower v. Cty. of Inyo*, 489 U.S. 593, 599, 109 S. Ct. 1378 (1989)). There is no dispute that a seizure occurred when Officer Nicoletti shot and killed Mr. Dennis. The question is whether that seizure was unreasonable.

Force is excessive when it is objectively unreasonable based on the totality of the circumstances. *See Groman*, 47 F.3d at 634. The central question is whether an officer applied force "in a good faith effort to maintain and restore discipline, or maliciously and sadistically to cause harm.'" *Brooks v. Kyler*, 204 F.3d 102, 106 (3d Cir. 2000) (quoting *Hudson v. McMillian*, 503 U.S. 1, 7 (1992)). To make that determination, courts look to a number of factors, including: the facts and circumstances of each particular case; the severity of the crime at issue; whether the suspect poses an immediate threat to the safety of the officers or others; whether the suspect is actively resisting arrest or attempting to evade arrest by flight; the duration of the action; whether the action takes place in the context of effecting an arrest; the possibility that the suspect might be armed; and the number of persons with whom an officer must contend at one time. *See Graham*, 490 U.S. at 396-97; *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997). The "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396.

Genuine issues of material fact exist regarding the reasonableness of Officer Nicoletti's use of deadly force. Taking the facts in the light most favorable to the Plaintiff, Mr. Dennis did not pose an immediate threat to any officer or civilian. By the time Officer Nicoletti shot him, his car had stopped moving, as the City's own investigation concluded. Even if it were moving, no one was in its immediate path. Although Officer Nicoletti claims that he fired because Officer Bogan was in danger, Officer Bogan was on the passenger side of the car and had holstered his weapon,

which suggests he did not perceive a threat to himself. Nor were there any civilian cars or pedestrians in the immediate vicinity who Mr. Dennis might have threatened. Mr. Dennis's hand motions might have raised a concern that he was reaching for a gun, or a factfinder could conclude that a reasonable officer would have perceived Mr. Dennis to be shifting gears. A reasonable factfinder could conclude, from these facts, that Officer Nicoletti's use of force was unreasonable.

To be sure, some undisputed facts favor Officer Nicoletti's position. Mr. Dennis tried to evade arrest, and he might have injured an officer while doing so. Also, a reasonable factfinder might interpret the disputed facts in a different way from the way the Court does for purposes of these motions. But the Court cannot resolve those disputes. A jury must.

### ii. Clearly established right

Qualified immunity "shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). Courts should not "define clearly established law at a high level of generality." *Sauers v. Borough of Nesquehoning*, 905 F.3d 711, 716 (3d Cir. 2018). A court need not identify a case directly on point for a right to be clearly established, but "existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017).

In assessing a claim of qualified immunity, like any other aspect of a summary judgment ruling, the court must not resolve genuine disputes of fact in favor of the moving party. It must decide whether the facts taken in the light most favorable to the

non-moving party take the case to a place where the law is not clearly established. *See Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (*per curiam*).

Taking the facts in that light, case law clearly established that Officer Nicoletti could not fire when he did. In 1999, the Third Circuit denied an officer's qualified immunity argument where the officer shot at an unarmed driver attempting to escape at slow speed who had hit a car. *See Abraham*, 183 F.3d 279. Twenty years later, in *Eberhardinger v. City of York*, the Third Circuit concluded that the earlier decision in *Abraham* placed an officer on notice that his conduct (using deadly force against an individual driving a car when the driver did not pose a threat to the safety of the officer or others) was unlawful. *See* 782 F. App'x 180 (3d Cir. 2019); *see also, e.g.*, *Lamont v. New Jersey*, 637 F.3d 177, 185 (3d Cir. 2011); *Plaza-Bonilla v. Cortazzo*, No. 07-2045, 2009 WL 605909 (E.D. Pa. Mar. 9, 2009) (where vehicle impacted other cars at low speed and officers were not in its path, that did not justify discharging weapon); *Orn v. City of Tacoma*, 949 F.3d 1167, 1178 (9th Cir. 2020) ("By . . . October 2011, at least seven circuits [including the Third Circuit in *Abraham*] had held that an officer lacks an objectively reasonable basis for believing that his own safety is at risk when firing into the side or rear of a vehicle moving away from him."). These decisions clearly established a rule that prohibited Officer Nicoletti's decision to fire.

2.   **Municipal liability**

A plaintiff who pursues a claim of municipal liability under § 1983 may proceed in two ways. He may "put forth that an unconstitutional policy or custom of the municipality led to his . . . injuries, or that [those injuries] were caused by a failure or inadequacy by the municipality that reflects a deliberate or conscious choice." *Forrest*

13

*v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019) (cleaned up). "Plaintiffs that proceed under a municipal policy or custom theory must make showings that are not required of those who proceed under a failure or inadequacy theory, and vice versa." *Id.* at 105. The two avenues "remain distinct: a plaintiff alleging that a policy or custom led to his or her injuries must be referring to an unconstitutional policy or custom, and a plaintiff alleging failure-to-supervise, train, or discipline must show that said failure amounts to deliberate indifference to the constitutional rights of those affected." *Id.* at 105-06; *see also Estate of Roman v. City of Newark*, 914 F.3d 789, 798-99 (3d Cir. 2019). ("[Plaintiff] has not pled a municipal policy . . . [but] has . . . adequately pled that the City failed to train, supervise, and discipline its police officers.").

Plaintiff asserts a failure/inadequacy claim, not a policy/custom claim. He asserts in the Complaint that the City suffered from "training and disciplinary failures" in a number of areas. (ECF No. 1 at 27 (Compl. ¶ 122).) And his Opposition to the City's Motion focuses on the City's failure to discipline Officer Nicoletti for past violations and argues that the "City's disciplinary failures . . . present a valid claim for municipal liability." (ECF No. 47 at 7.) The Court therefore focuses its analysis on evidence to support a failure to train or discipline claim, rather than a custom or practice claim. As a result, the Court need not address the City's arguments about the adequacy of its formal policies and procedures.

A plaintiff asserting a failure/inadequacy claim must show that "(1) municipal policymakers know that employees will confront a particular situation, (2) the situation involves a difficult choice or a history of employees mishandling, and (3) the wrong choice by an employee will frequently cause deprivation of constitutional

14

rights." *Forrest*, 930 F.3d at 106; *see also Roman*, 914 F.3d at 798. The evidence the Court considers in this analysis should not be "unduly narrow." *Thomas v. City of Philadelphia*, No. CV 17-4196, 2019 WL 4039575, at *20 (E.D. Pa. Aug. 27, 2019).

A plaintiff does not need to establish that a municipal policymaker had actual knowledge of a pattern of constitutional misconduct. Constructive knowledge or a showing that the municipal policymaker "should have known" about the pattern of constitutional misconduct is sufficient. *See Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 407 (1997). In addition, for a municipality to be liable, "the identified deficiency in a training[, supervision, or discipline] program must be closely related to the ultimate injury, which means the plaintiff must prove that the deficiency in training[, supervision, or discipline] actually caused the constitutional violation at issue." *Logan v. Bd. of Educ. of the Sch. Dist. of Pittsburgh*, 742 F. App'x 628, 633 (3d Cir. 2018) (citing *Doe v. Luzerne Cty.*, 660 F.3d 169, 180 (3d Cir. 2011).

Plaintiff makes two arguments to support his claim. First, he argues that the City's disciplinary process, writ large, is "inept." (ECF No. 47 at 2.) He bases that argument on statistics in an article published in City and State Pennsylvania in February 2018 about the outcome of PPD IAD investigations. That article is hearsay, though, because it was made out of court and Plaintiff cites it to prove the truth of the matter asserted. "Hearsay statements that would be inadmissible at trial may not be considered for purposes of summary judgment." *Smith v. City of Allentown*, 589 F.3d 684, 693 (3d Cir. 2009); *Louiseau v. City of Philadelphia*, No. 15-4010, 2017 WL 3142334, at *1 n.3 (E.D. Pa. July 25, 2017) (news article was hearsay that could not be considered

to establish § 1983 municipal liability). Plaintiff has no other evidence about the City's disciplinary system, writ large.

Second, Plaintiff argues that the City's failure to discipline Officer Nicoletti demonstrates the City's deliberate indifference. This argument fares better. Prior to this shooting, Officer Nicoletti had shot at two other people. One of those situations had facts very similar to the facts in this case. An initial investigation concluded that he violated PPD policies when he discharged his weapon at a moving vehicle, but the PPD did not discipline him or require additional training. In addition, prior to 2018, four people had filed official complaints against Officer Nicoletti for excessive force and physical abuse. None of the complaints resulted in discipline. The City also defended Officer Nicoletti in two lawsuits prior to this matter, one involving the use of excessive force, one involving covering up the use of excessive force. It does not appear the PPD took any disciplinary action in either of these cases. In fact, his disciplinary history does not even report these cases.

This is enough to create a genuine issue of material fact. While the Department argues all police discharges are investigated, "mere Department procedures to receive and investigate complaints [does not] shield the City from liability. It is not enough that an investigative process be in place. . . . The investigative process must be real. It must have some teeth." *Beck v. City of Pittsburgh*, 89 F.3d 966, 974 (3d Cir. 1996). A reasonable jury could find that the PPD knew Officer Nicoletti would face situations like the one at issue here (stops and arrests), that those situations involved difficult choices that Officer Nicoletti had a history of mishandling (complaints and litigation related to excessive force, police discharges, and concealing the use of

excessive force), and making the wrong choice in those situations would frequently cause a deprivation of constitutional rights (Fourth Amendment). In other words, a reasonable jury could find the PPD's deliberate indifference in the face of Officer Nicoletti's prior conduct led to Mr. Dennis's death.

The City argues that the Court should not consider these past incidents because they took place more than five years before the shooting at issue. The Court disagrees. The Third Circuit has not imposed a bright-line 5-year rule for deliberate indifference claims. In *Watson v. Abington Twp.*, 478 F.3d 144 (3d Cir. 2007), the court noted that events older than five years were not relevant to prove the existence of a policy or custom. *See* 478 F.3d 144, 156 (3d Cir. 2007). The court did not consider a deliberate indifference claim. In *Beck*, the court noted that events that had occurred in the last five years could establish deliberate indifference, but it did not rule out the possibility that older events might be relevant. *See* 89 F.3d at 971-75. When a municipality becomes aware of a potential problem, it cannot stick its head the sand, cross its fingers, and hope that the problem does not arise for the next five years. It has to act to address the problem. Officer Nicoletti's history presents evidence from which a factfinder could conclude that he posed a problem, and the City has not offered any evidence that it took any action to correct or avoid that problem.

## C.   State Law Claims

Although "[a] police officer may use reasonable force to prevent interference with the exercise of his authority or the performance of his duty," he nevertheless "may be held liable for assault and battery when a jury determines that the force used in making an arrest is unnecessary or excessive." *Renk v. City of Pittsburgh*, 537 Pa.

68, 641 A.2d 289, 293 (Pa. 1994). "The reasonableness of the force used in making the arrest determines whether the police officer's conduct constitutes an assault and battery." *Id.*; *see also Boyden v. Twp. of Upper Darby*, 5 F. Supp.3d 731, 744 (E.D. Pa. 2014).

The Court has already concluded that a jury reasonably could conclude that Officer Nicoletti's use of force was objectively unreasonable. Officer Nicoletti, using unreasonable and therefore unprivileged force, aimed his gun at Mr. Dennis, putting him in a reasonable and immediate apprehension of harmful contact. When Officer Nicoletti fired, the three bullets struck Mr. Dennis, causing a harmful contact. It follows that Officer Nicoletti's conduct constituted an assault and battery.

In his Reply, Officer Nicoletti argues for the first time that the Pennsylvania Tort Subdivision Claims Act immunizes his conduct. He did not make that argument in his opening brief, and it is therefore waived. *See Pruitt v. Tripadvisor Inc.*, Civ. A. No. 20-3836, 2021 WL 242470, at *2 n.2 (E.D. Pa. Jan. 25, 2021). In any event, that statute does not apply to conduct that constitutes willful misconduct. Officer Nicoletti's conduct was willful, and a jury will have to decide if it was misconduct. The PTSCA does not protect him.

## IV.   CONCLUSION

Juries are the bedrock of the American justice system. When parties have factual disputes, they present those disputes to a jury of their peers for resolution. The factual disputes here require a jury trial to resolve. Therefore, the Court will deny

18

Defendants' motions, except that it will grant the City's motion as to Count I against Officer Nicoletti in his official capacity. An appropriate Order follows.

**BY THE COURT:**

January 29, 2021

*/s/ Joshua D. Wolson*
JOSHUA D. WOLSON, J.